* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence or to rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employee/employer relationship existed between Plaintiff and Defendant-Employer.
3. Plaintiff's average weekly wage at the time of the incident was $420.00 per week.
4. All Industrial Commission forms which have been filed in this matter are stipulated into evidence as true and authentic copies of what they purport to be and they are part of the official record of the case.
5. All the medical reports from Triangle Orthopaedic Associates and Granville Medical Center are stipulated into evidence.
6. The issues to be determined from the hearing are as follows:
 a) Whether Plaintiff sustained an injury by accident or developed an occupational disease as a result of his employment with Defendant-Employer?
 b) If so, what, if any, benefits is Plaintiff entitled to receive under the North Carolina Workers' Compensation Act?
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff started working for Defendant-Employer at its distribution facility outside of Henderson, North Carolina on approximately July 1, 2002, when he was forty years old. Plaintiff's job duties included loading refrigerated goods for distribution to the stores. Defendant-Employer's job description for Plaintiff included the following essential functions: (a) sit and kneel occasionally, stand, bend, stoop, squat, climb stairs and steps continuously while processing orders; (b) reach above shoulder level frequently; (c) lift up to one hundred pounds continuously while preparing order; (d) push, pull, twist upper body continuously; (e) carry freight one to one hundred feet frequently; (f) repetitive hand movements, grasping turning, and firm manipulation; (g) inside working and working with heights; and (h) communicate effectively with customers and other Wal-Mart associates.
2. The distribution center where Plaintiff worked consisted of a cooler section and a freezer section. The temperature in the cooler section was maintained at approximately thirty-two degrees Fahrenheit, and the temperature in the freezer section was maintained at twenty degrees below zero Fahrenheit.
3. Plaintiff usually worked a weekend shift, and his workday was scheduled for eleven hours, beginning at four o'clock in the morning. Although Plaintiff would sometimes work an eleven-hour shift, his shift usually lasted eight or nine hours. Plaintiff normally worked twelve days per month. Two to three of those days he worked in the freezer section.
4. Plaintiff's job required him to fill orders for delivery from items stored in either the cooler or freezer section. All of the items in the cooler and freezer sections were boxed in cases. Orange juice was one type of produce stored in the cooler section and a case of orange juice containing four or six gallons would weigh between twenty and twenty-eight pounds. A case of juice was the heaviest item in the cooler section and a case of cheese was the lightest. Plaintiff manually lifted cases of refrigerated goods and stacked them on an electric pallet. The number of cases of refrigerated goods Plaintiff would have to pick up at a time would vary. Plaintiff would either slide cases of refrigerated goods or carry them to the pallet for stacking.
5. With respect to the freezer section, TV dinners, ice cream, meat items and frozen orange juice were some of the types of items stored. The heaviest items in the freezer section were meat items weighing up to approximately forty-fifty pounds.
6. Each morning before the workers began to pull orders, they had a team meeting. After the meeting, the team was required to get their head gear and headset and be prepared to go to work. Plaintiff testified that the only equipment or type of machine he used in filling his orders was an electric pallet jack. Plaintiff would either ride on or walk in front of the electric pallet jack and would pull one or two pallets at a time. Plaintiff listened to computer-generated instructions read through his headset and walked down the aisles to pull items to fill the orders. The items had to be manually placed on the pallet.
7. Plaintiff testified that he would stack cases as high as he could reach and he would often stack cases a couple of feet above his head. When Plaintiff had to stack orders above his head level, he would either toss the cases overhead or stand on top of another case and reach overhead. Consistently throughout the day Plaintiff would have to lift cases and stack them to chest level or overhead and every time he filled an order, he would have to load cases overhead. Plaintiff is five feet two inches tall and weighs approximately one hundred twenty-five pounds.
8. Plaintiff testified that his position was a production job and a person in his position would have to meet ninety percent of the established productivity goal or he could be fired. Plaintiff felt pressured to work quickly and if he pulled one hundred and thirty percent of his goal he could make an extra two hundred dollars a paycheck. From the start of the work shift until whenever it ended, Plaintiff stacked cases on pallets lifting as much as sixty pounds at a time.
9. Brad Cook testified that he was the area manager in the freezer, deli, dairy and shipping section for Defendant-Employer. He testified that the aisles were arranged to allow the heavy cases to be picked up first and then the lighter cases.
10. After working in the distribution center for approximately three months, Plaintiff began to experience weakness and pain in his left arm. Plaintiff initially suspected that this pain was the result of problems with his left rotator cuff, as he had previously injured his left rotator cuff, necessitating surgery approximately eight years earlier.
11. Plaintiff continued to work. The pain in his left arm progressively worsened to the point where he had little use of his left arm. He could not even lift it above his waist. When the symptoms continued to worsen, Plaintiff told his supervisor about the difficulty he was having using his left arm. He also told his supervisor that he thought it was related to his previous left rotator cuff injury and that he felt he should seek medical attention.
12. On October 24, 2002, Plaintiff was seen and evaluated by Dr. William A. Somers, an orthopaedic surgeon at Triangle Orthopaedic Associates. Dr. Somers ordered a series of diagnostic studies, including x-rays, MRIs, and a nerve conduction study. Dr. Somers believed that Plaintiff's left arm problems were caused by a medical condition in his neck, not in his left shoulder or left arm.
13. Plaintiff was subsequently seen by Dr. John Guisto of Triangle Orthopaedic Associates who performed an EMG study that showed severe cervical radiculopathy on the left side, involving the C5-C6 nerve roots. Two MRIs were taken of Plaintiff's left shoulder, which ruled out the shoulder as the cause of the symptoms. In addition, an MRI was taken of Plaintiff's cervical spine, which showed multi-level stenosis with significant changes on the left side, in particular at C4-C5, C5-C6, and C6-C7.
14. When Plaintiff initially presented to Triangle Orthopaedic Associates he reported relatively severe pain and profound weakness and rapidly developing atrophy. Electrical studies showed denervation changes, indicating that Plaintiff had experienced an active loss of muscle function in a short period of time and was continuing to lose muscle function very rapidly.
15. On January 31, 2003, Plaintiff began treatment with Dr. Ralph A. Liebelt, an orthopaedic surgeon with Triangle Orthopaedics Associates. An MRI of the cervical spine showed multi-level stenosis with significant changes on the left side, in particular at the C4-5 and C5-6 with some lesser changes at C6-7. Dr. Liebelt diagnosed Plaintiff with degenerative disc disease with multi-level radiculopathy and stenosis. Dr. Liebelt testified that Plaintiff developed atrophy very quickly with a loss of muscle function. Dr. Liebelt was of the opinion that Plaintiff's loss of strength was due to the significant compression of the nerve roots. Dr. recommended an anterior decompression at multiple levels.
16. Prior to Plaintiff's employment with Defendant-Employer, he had never experienced work-disabling, degenerative disc disease or cervical radiculopathy.
17. On February 28, 2003, Dr. Liebelt performed surgery on Plaintiff consisting of a three-level, anterior cervical decompression fusion from the C4-5 level to the C6-7 level, using allograph, or donated bone, for the inner body grafts, along with an internal plate to secure the fusion.
18. Plaintiff improved significantly after his surgery, but Dr. Liebelt testified that Plaintiff continued to experience persistent atrophy of two muscle groups that may never completely return to normal, intermittent discomfort due to degenerative changes in the facet joints and pain related to the scarring around the nerve roots where Plaintiff had developed severe radiculopathy.
19. On June 6, 2003, Dr. Liebelt cleared Plaintiff to return to work, even though he was a little anxious about doing so, as only a little more than three months had elapsed since his multi-level fusion surgery with allograph. Plaintiff returned to work the following day and continued to work until he was fired for reasons unrelated to his injury. Dr. Liebelt cleared Plaintiff to return to work, in part, because Plaintiff was anxious to return to work. Dr. Liebelt cautioned Plaintiff to be very careful about how he lifted objects and to use proper body mechanics. Dr. Liebelt testified he would not normally release a patient with Plaintiff's condition until approximately six months after surgery.
20. Dr. Liebelt opined and the Full Commission finds as fact that the repetitive overhead lifting of up to 60 pounds, and forward, overhead pushing in the cold environment, especially with a person of Plaintiff's small stature, aggravated his pre-existing degenerative disc disease to the extent that the aggravation caused the development of his severe cervical radiculopathy.
21. Dr. Liebelt opined and the Full Commission finds as fact that Plaintiff's job duties with Defendant-Employer as described above placed him at an increased risk over that of the general public not so employed for aggravating his degenerative disc disease to the extent that it caused severe cervical radicular changes.
22. Dr. Liebelt opined that Plaintiff's severe cervical radiculopathy is consistent with the type of work he was performing and that the severe radicular changes that Plaintiff developed may never have occurred had he not been doing some of the activities that he was doing in his job. Dr. Liebelt testified that Plaintiff's job activities and the physical demands of the job, placed the job in the heavy category of work based upon the Department of Labor's criteria. Dr. Liebelt further opined that Plaintiff was at a higher risk for injury because of his pre-existing degenerative disc disease, but Plaintiff would have been much less likely to develop severe cervical radiculopathy if he had been employed in a more sedentary or light-duty position.
23. Dr. Liebelt was aware that Plaintiff did a lot of repetitive lifting, that much of it was overhead, and that he lifted up to sixty pounds. Dr. Liebelt was also aware that Plaintiff would have to do some lifting and pushing in the overhead position which in his opinion put significant strain on Plaintiff's cervical spine and upper torso. The Full Commission finds that Dr. Liebelt's understanding of Plaintiff's job duties was consistent with Plaintiff's rendition of his job duties and his job duties as outlined in his job description, and was sufficient for Dr. Liebelt to be capable of rendering a medical opinion as to whether Plaintiff's job duties placed him at an increased risk of aggravating his degenerative disc disease and developing cervical radiculopathy and whether those job duties significantly contributed to, or were a significant causal factor in the aggravation of his degenerative disc disease to such an extent that he developed severe, disabling cervical radiculopathy requiring surgery.
24. Dr. Liebelt testified and the Full Commission finds as fact that the condition of Plaintiff's cervical spine qualified him for a permanent partial disability rating of up to fifty percent; however, Plaintiff has not reached maximum medical improvement, nor has he actually been evaluated for a permanent partial disability rating.
25. Plaintiff has proven his employment placed him at an increased risk of aggravating his pre-existing degenerative disc disease and for contracting severe cervical radiculopathy when compared to the general public not so employed. Plaintiff has also proven that his employment significantly contributed to or was a significant causal factor in the aggravation of his pre-existing degenerative disc disease and the development of his disabling, cervical radiculopathy. Therefore, Plaintiff has proven that he contracted a compensable occupational disease under N.C. Gen. Stat. § 97-53(13).
26. Plaintiff has failed to prove an injury by accident because his condition did not develop over a cognizable period of time.
27. As a result of his disabling cervical radiculopathy and resulting surgery, Plaintiff was unable to work from the time of his surgery, on February 28, 2003, until his release to return to work with Defendant-Employer on June 6, 2003, a period of fourteen weeks.
28. The medical treatment Plaintiff received as a result of his occupational disease was reasonably required to effect a cure, provide relief and lessen his disability.
29. Plaintiff's average weekly wage on the relevant dates was $420.00, which results in a compensation rate of $279.72.
30. As a result of his disabling cervical radiculopathy and resulting surgery, Plaintiff sustained some degree of permanent partial impairment. Plaintiff's entitlement to permanent partial disability is reserved for subsequent determination.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove an injury by accident as his condition did not develop over a cognizable period of time. N.C. Gen. Stat. § 97-52.
2. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significant contributed to, or was a significant causal factor in, the disease's development. Hardin v. MotorPanels, Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000) (citingRutledge v. Tultex, supra). Even where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition.Futrell v. Resinall Corp., 357 N.C. 158, 579 S.E.2d 269 (2003).
3. It has been held that when a pre-existing, non-disabling, non-job-related disease is "aggravated or accelerated by causes and conditions characteristic of and peculiar to claimant's employment" so that disability results, the employee must be compensated under the Act. Walston v. Burlington Industries,304 N.C. 670, 285 S.E.2d 822, as amended, 305 N.C. 296, 297,285 S.E.2d 822, 823 (1982). Wilkins v. J.P. Steven Co.,333 N.C. 449, 454, 426 S.E.2d 675, 678 (1993), further sharpens the requirement for compensability in this setting: "[I]t must be shown factually that but for workplace aggravation of the non-occupational disease there would not have been the same incapacity for work for which compensation is sought." Dr. Liebelt was of the opinion that the physical demands of Plaintiff's work placed him at an increased risk for aggravating the underlying degenerative disc disease to the extent that it progressed from being asymptomatic to the point where it involved severe cervical radicular changes and significantly contributed to his development of severe cervical radiculopathy when compared with members of the public not so employed. Moreover, Dr. Liebelt opined, to a reasonable degree of medical certainty, that the work activities and Plaintiff's job demands significantly contributed to the aggravation of, and may have accelerated, the pre-existing condition of degenerative disc disease causing the development of severe cervical radiculopathy
4. Plaintiff has proven his employment created an increased risk over the general public not so employed for aggravating and accelerating his degenerative disc disease to such an extent that he developed disabling cervical radiculopathy and the existence of a causal connection between the disease and his employment in that the employment significantly contributed to or was a significant causal factor in the aggravation of his degenerative disc disease and development of his disabling cervical radiculopathy. Plaintiff has therefore proven that he contracted a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
5. Plaintiff earned an average weekly wage of $420.00, yielding a compensation rate of $279.72. N.C. Gen. Stat. § 97-2(5).
6. As a result of his compensable occupational disease, Plaintiff was unable to engage in activities required by his job or any employment from February 28, 2003 through and including June 6, 2003, and is entitled to be paid by Defendants total disability compensation at the rate of $279.72 per week from February 28, 2003 through and including June 6, 2003. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to have Defendants pay for all medical expenses incurred or to be incurred in the future as a result of his compensable occupational disease for so long as such treatment is reasonably necessary to effect a cure, provide relief and/or lessen his period of disability. N.C. Gen. Stat. §§97-2(19); 97-25.
8. As a result of his occupational disease and resulting surgery, Plaintiff sustained some degree of permanent partial impairment yet to be rated after he reaches maximum medical improvement. Plaintiff's entitlement to permanent partial disability is reserved for subsequent determination. N.C. Gen. Stat. § 97-31.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation from February 28, 2003 through June 6, 2003, at the rate of $279.72 per week. These amounts have accrued and shall be paid in a lump sum.
2. Defendants shall pay all of Plaintiff's past and future medical expenses related to his compensable occupational disease for so long as such treatment is necessary to effect a cure, provide relief and/or lessen his period of disability when bills for the same have been approved according to Industrial Commission procedure.
3. Twenty-five percent of the compensation awarded Plaintiff herein is approved as a fee for Plaintiff's attorney and shall be deducted and paid directly to Plaintiff's attorney.
4. Plaintiff's entitlement to permanent partial disability after his return to work is reserved for subsequent determination. The parties may by agreement execute a Form agreement to pay Plaintiff's permanent partial disability rating. If so, Plaintiff's attorney would be entitled to a twenty-five percent attorney fee.
5. Defendants shall pay the costs of this action.
This the __ day of June 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER